GERMAN SAVINGS INST. v. DE LA VERGNE REFRIGERATING MACH. CO. et al.[1]

(Circuit Court of Appeals, Eighth Circuit. October 7, 1895.)

No. 511.

1. SPECIFIC PERFORMANCE—DEFENSES—TECHNICAL FAILURES OF COMPLAINANT.
    One who receives the benefits of the substantial performance of a contract, and retains them, after a technical default in the performance by

[1] Rehearing denied February 3, 1896.

the other party, until it is impossible to put the latter in the situation he occupied when the contract was made, and when the default occurred, cannot entirely defeat a suit for specific performance, on the ground that the complainant has failed to completely perform the contract on his part.

**2. SAME.**

One of two rival manufacturing corporations, having made an assignment for the benefit of creditors, contracted, in conjunction with its stockholders, to sell to the other all its assets, including good will, subject to its debts, and to transfer all the shares of its capital stock, with a covenant not to enter the same business for 10 years. A bill of sale and assignments of the stock were accordingly made. About one-fourth of the stock was held by executors and trustees, and their assignments thereof were made without a previous order of the probate court. No objection was made on this ground for more than two years, during which the purchaser had all the advantages of the legal possession of the property and good will of the seller, and the suppression of its competition. The purchaser failed to perform its part of the contract, and suit was brought for specific performance. *Held*, that the defect in the assignment of the stock in question was not a complete defense to the suit, but constituted at most merely a ground of damages, if the stock were shown to have any value, which might be set off against the cash payments agreed to be made by the purchaser.

**3. SAME—DEFENSES.**

A contract, of which specific performance was sought, required, on complainant's part, the execution of a bill of sale and the assignment of corporate stock within a time specified. The papers were executed and delivered within that time, but on the day following its expiration the purchaser's attorney pointed out certain alleged defects, and suggested the making of further assurances. This suggestion was complied with, and the new papers were delivered two days later. No further objection to the sufficiency of the performance of the contract by complainant was made for several months, during which defendant enjoyed all the advantages of a full performance. *Held*, that defendant had waived the objection that the instruments were not delivered in the time specified.

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

Leo Rassieur and B. Schnurmacher, for plaintiff in error.

George A. Madill and Charles Nagel, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The German Savings Institution, a corporation, the plaintiff in error, brought an action against the De La Vergne Refrigerating Machine Company, a corporation, and John C. De La Vergne, the principal stockholder of that corporation, the defendants in error, for that portion of the purchase price of the assets, good will, and capital stock of the Consolidated Ice Machine Company, a corporation, which the defendants in error promised to pay to it by a written agreement made on April 16, 1891. The plaintiff was a stockholder of the Consolidated Ice Machine Company, and the defendants answered that the plaintiff and his costockholders had failed to assign the stock of that company as they had promised to do in this agreement. The case was tried by the court upon an agreed statement of facts, and a judgment was rendered for the defendants. These were the material facts:

The De La Vergne Refrigerating Machine Company, hereafter called

the De La Vergne Company, was a corporation of the state of New York, and the Consolidated Ice Machine Company, hereafter called the Consolidated Company, was a corporation of the state of Illinois. These corporations were engaged in manufacturing and selling ice-making machines, and were rivals in that business. On October 14, 1890, the Consolidated Company made a general assignment for the benefit of its creditors. On April 16, 1891, that company and its stockholders, one of whom was the plaintiff, made a bill of sale and an agreement with the De La Vergne Company and De La Vergne which recites that, "whereas, * * * the assets of the said party of the first part (the Consolidated Company), in the opinion of the said party of the second part (its stockholders), exceed in value the liabilities thereof, and consist in part of the good will of said party of the first part (which good will has been established by six years of successful manufacture of refrigerating and ice-making machines, together with an expenditure of the earnings from such manufacture); and whereas the said party of the third part (the De La Vergne Company) is willing to acquire such rights as the said parties of the first and second parts can assign in and to the said assets, subject to the obligations of said party of the first part: * * * Now, therefore, in view of the premises, and for and in consideration of the mutual advantages to be gained by the execution of this contract," the Consolidated Company and its stockholders "agree and covenant to and with the parties of the third and fourth parts (the De La Vergne Company and De La Vergne) to bargain, sell, and convey, and by these presents do bargain, sell, and convey, unto the said party of the third part, all their right, title, and interest in and to the assets of the said party of the first part, subject to the payment of its obligations"; the De La Vergne Company and De La Vergne covenanted and agreed to issue to the plaintiff in error the full-paid capital stock of the De La Vergne Company to the amount of $2,500 par value, to issue to its costockholders a proportionate amount of such stock so that all the stockholders would receive in the aggregate $100,000 in such stock; the stockholders of the Consolidated Company agreed to assign to De La Vergne, within 10 days from the date of the agreement, all the full-paid stock of the Consolidated Company, which was 1,000 shares, to take $100,000 in cash in lieu of the $100,000 in stock of the De La Vergne Company, and promised and agreed not to enter into the business of selling ice-making machines in the United States, except in the state of Montana, for 10 years; and the De La Vergne Company and De La Vergne agreed to issue the $100,000 of capital stock in the De La Vergne Company to the stockholders of the Consolidated Company, within 60 days after the stock of the latter company was assigned to De La Vergne. Within 10 days after the date of this agreement, the certificates which represented the 1,000 shares of the stock of the Consolidated Company, and written assignments of that stock executed by the parties who held the certificates, were delivered to De La Vergne, but 125 of these shares were held by P. J. Lingenfelder and Leo Rassieur as executors, and 90 shares were held by them as trustees, under the will of E. Jungenfeld, deceased, and they

assigned these shares, without an order authorizing them so to do from the probate court in the state of Missouri in which the estate of Jungenfeld was in the process of administration. On April 27, 1891, four specific defects in the assignments of the 1,000 shares of stock were pointed out by counsel for De La Vergne, and the means of curing them were suggested. On April 29, 1891, these defects were cured by the delivery to the counsel of De La Vergne of suitable instruments of further assurance of title. No objection was made in this letter, or at any time prior to April 10, 1893, that the assignments of the executors and trustees were insufficient because no order of the probate court had been obtained authorizing the assignment. On the other hand, the counsel for De La Vergne wrote on April 27, 1891, respecting 25 of these shares: "These shares are transferred by the signature of P. J. Lingenfelder and Leo Rassieur, executors of Ed Jungenfeld, deceased, which, of course, would be regular." In July, 1891, the former stockholders of the Consolidated Company demanded the $100,000 of capital stock in the De La Vergne Company, but they received no response to their demand until September 12, 1891, when the counsel for De La Vergne objected to issuing and delivering this stock on several frivolous grounds, one of which was that the stock of the Consolidated Company had not been assigned in time, and wrote: "Pending further information on these points, I have still in my possession the papers which you have sent me, and sent to Mr. De La Vergne, which, of course, if my views as above expressed are correct, I am ready to pass over to whoever is legally entitled to the custody of the same, which is a question which I am not willing personally to decide." The right to the assets of the Consolidated Company, subject to its liabilities, and the good will of its business, which were conveyed to the De La Vergne Company by the bill of sale and agreement of April 16, 1891, were never reconveyed; the covenant of the stockholders to refrain from transacting the ice-making business for 10 years was never released; and none of the certificates and assignments of the stock of that company were ever delivered back to its former stockholders. It is assigned as error that upon this state of facts the judgment should have been for the plaintiff.

One who receives the benefits of the substantial performance of a contract, and retains them, after a technical default in the performance by his adversary, until it is impossible to put the latter in the situation in which he was when the contract was made, and when the default occurred, cannot entirely defeat an action for the specific performance of the contract, or an action for the price named in the agreement, on the ground that the plaintiff has failed to completely perform the contract on his part. When a contract has been partially performed, and one of the parties to it makes default, the other has a choice of remedies. He may and he must rescind or affirm the contract, but he cannot do both. If he would rescind it, he must immediately return whatever of value he has received under it, and then he may defend against an action for specific performance, or for the price of the property (if the agreement was a contract of sale), and he may recover back whatever he has paid or

delivered under it. On the other hand, he may, and if he retains its benefits he does, affirm the contract, and in that case he can maintain a suit for specific performance against his adversary, or an action for damages for failure to perform, or he may, if opportunity offers, offset those damages against the amount he has agreed to pay under the contract. He cannot, however, while he retains the benefits of a substantial performance, totally defeat an action for the price which he has agreed to pay, or for the specific performance of the contract on his part, on the ground that the plaintiff has not completed the performance required of him by the contract. He cannot at the same time affirm the contract by retaining its benefits and rescind it by repudiating its burdens. Hunt v. Silk, 5 East, 449; Hammond v. Buckmaster, 22 Vt. 375; Brown v. Witter, 10 Ohio, 143; Dodsworth v. Iron Works, 13 C. C. A. 552, 557, 66 Fed. 483; Swain v. Seamens, 9 Wall. 254, 272; Beck v. Bridgman, 40 Ark. 382, 390; Andrews v. Hensler, 6 Wall. 254, 258; Conner v. Henderson, 15 Mass. 319, 321; Teter v. Hinders, 19 Ind. 93; Howard v. Hayes, 47 N. Y. Super. Ct. 89, 103; Welsh v. Gossler, Id. 112; Underwood v. Wolf, 131 Ill. 425, 23 N. E. 598; Brown v. Foster, 108 N. Y. 387, 15 N. E. 608; Vanderbilt v. Iron Works, 25 Wend. 665; Lyon v. Bertram, 20 How. 149, 153–155; Clark v. Steel Works, 3 C. C. A. 600, 53 Fed. 494, 499; Voorhees v. Earl, 2 Hill, 288, 294; Barnett v. Stanton, 2 Ala. 181; Churchill v. Holton, 38 Minn. 519, 38 N. W. 611; Treadwell v. Reynolds, 39 Conn. 31; 21 Am. & Eng. Enc. Law, 557, note 2. The reason of this principle is that the retention of the benefits of substantial performance after default is utterly inconsistent with the position that the default has released the party who has received these benefits, so that he is not bound to perform his part of the contract. It is a silent notice that performance will be required of the defaulter, and will be made by the recipient of the benefits. The retention of the rights or properties deprives the defaulting party of all use of them, when, if they were reconveyed to him at once upon default, he might immediately sell them to another for their value, or use them himself to his own advantage. When, therefore, one has retained such property, or the benefits derived from such a contract, without any claim that default has been made, or any notice of an intention to refuse performance, for so long a time after the default that the defaulting party has been deprived of a substantial part of their value or their use, it is unjust and inequitable to permit the recipient of the benefits to totally defeat an action for the contract price. The just rule is that the contract must then stand, that an action upon the contract can be maintained by him who has substantially performed, notwithstanding his technical default, and that the amount of the recovery will be measured by the contract price, less the damages sustained by the defendant from the failure of the plaintiff to complete the performance on his part. This rule applies to executory contracts of all kinds,—to contracts for the exchange, for the leasing, and for the sale of real estate (Beck v. Bridgman, Hunt v. Silk, Teter v. Hinders, Brown v. Witter, Swain v. Seamens, supra); to contracts for the manufacture and sale of machinery and goods

(Hammond v. Buckmaster, Dodsworth v. Iron Works, Andrews v. Hensler, Howard v. Hayes, supra); and to contracts for the sale of personal property (Lyon v. Bertram, Clark v. Steel Works, and other authorities cited supra).

In Beck v. Bridgman, 40 Ark. 382, 390, Bridgman brought an action against Mrs. Beck to compel specific performance of a contract between them to exchange real and personal property. Mrs. Beck had taken possession of Bridgman's real estate in Illinois which was covered by the contract, and he had given her title to all but 10 acres of it, but he could not, and never did, procure for her the title to this 10 acres. She refused to convey to Bridgman her lands in Arkansas covered by the contract, because he had not conveyed this 10 acres, and insisted that he could not recover on the contract because he had not completed, and could not complete, the performance of it on his part. The court enforced specific performance, and allowed Mrs. Beck $300 for the failure of Bridgman to convey the 10 acres. Judge Eakin, in delivering the opinion of the supreme court of Arkansas, which affirmed this decree, said: "To allow her to hold all she could get of the Illinois property, and give nothing in exchange, would be absolutely shocking."

In Hammond v. Buckmaster, 22 Vt. 375, 379, 380, Ford had agreed with Buckmaster, the defendant, to manufacture wool furnished by him into cloth, and to deliver the cloth to him from time to time as it was manufactured. The defendant agreed to sell and consign the cloth, to advance to Ford one-third of the selling price as fast as the cloth was consigned, and to pay to him the residue of the price when it was collected, less the value of the wool. Some cloth had been delivered to the defendant, and had been sold and consigned by him. Hammond, the assignee of Ford, sued him for the advances he had promised to make on these consignments, and alleged performance on the part of Ford. The defense was that Ford had not performed his part of the contract, but had converted some of the cloth made from the wool of the defendant to his own use. The trial court charged the jury that, if this was true, it was a good defense to the action. The supreme court of Vermont said:

"If the charge of the court can be sustained, it must be upon the ground that a breach of the contract on the part of Ford gave to the defendant a right to repudiate it. But it could not have that effect. The general rule of law is that a contract cannot be rescinded by one party for the default of the other, unless both parties can be placed in statu quo, as before the contract. In the present case the contract had been in part executed, and each party had received a partial benefit from the contract, and the parties could not be placed in statu quo. The agreement in this case must stand, and the defendant must perform his part of it; and, if there has been a breach of the contract by the other party, he must seek a compensation in damages of such party by a cross action."

In Hunt v. Silk, 5 East, 449, Silk agreed to make certain alterations in a dwelling house, and to execute a lease to Hunt within 10 days. Thereupon Hunt paid Silk £10, and took and retained possession of the house for 12 days. Silk failed to make the alterations within the 10 days, and in 12 days Hunt surrendered possession, and sued for his £10. Lord Ellenborough said:

"Now, where a contract is to be rescinded at all, it must be rescinded in toto, and the parties put in statu quo. * * * If the plaintiff might occupy the premises two days beyond the time when the repairs were to have been done and the lease executed, and yet rescind the contract, why might he not rescind it after a twelvemonth on the same account. This objection cannot be gotten rid of; the parties cannot be put in statu quo."

These expressions in this opinion, and the decision that Hunt could not recover in that case, were quoted with approval by the supreme court in Lyon v. Bertram, 20 How. 149, 153, 154.

Perhaps these cases sufficiently illustrate the rule we have been considering, and, in our opinion, the case at bar falls far within it, and must be governed by it. Conceding that the 215 shares of the capital stock of the Consolidated Company which were held by Lingenfelder and Rassieur as executors or trustees were never legally assigned to De La Vergne, because the assignments made and delivered on April 26, 1891, were not authorized by any order of the probate court, the facts remain that the Consolidated Company and its stockholders substantially performed their part of this contract, and that the defendants received and retained all the benefits of their performance. The rights and benefits which the defendants were to receive from this contract were the right of the Consolidated Company to its assets, subject to the payment of its debts, the good will of its business, which had been established for six years, the suppression of the competition of that company and of its stockholders, and the legal control of the suppressed corporation. The consideration the defendants were to pay for these interests was $100,000 in stock or in money. They received, retained, and had the benefit of all these rights and interests, and now refuse to pay the agreed price, because the stockholders of the Consolidated Company failed to completely perform their contract in that they did not legally assign to De La Vergne, who received assignments of more than three-fourths of its stock, less than one-fourth of the stock of a corporation that had conveyed away all of its assets and the good will of its business. There is nothing in this record to show that this small minority of the stock was of any value. If it was, the defendants may undoubtedly show that fact under proper pleadings, and offset the damage they have sustained by the failure to assign it against the $100,000 they promised to pay for the substantial benefits of this contract. But this is the limit of their defense, and the burden is upon them to establish it. There is no evidence in this record that it has any substantial merit, and it is exceedingly difficult to see how the failure to assign this small minority of the stock could have resulted in any damage to them whatever. However that may be, they did receive and retain the right of the corporation to its assets subject to its debts, the good will of its business, the suppression of the competition of the corporation and its stockholders, and, by the valid assignment of more than three-fourths of its stock, the legal control of the corporation. These would seem to be all the benefits, and they were certainly all the substantial benefits, they could have received from the complete and technical performance of the contract. After the conveyance and covenant of

April 16, 1891, was executed and delivered, the corporation was nothing but an empty shell. All its valuable rights and property had been vested in the De La Vergne Company, and the legal control of the shell itself was given to De La Vergne by the valid assignment of a majority of the stock of the corporation. These defendants cannot retain these benefits, and thus make $100,000 for themselves, and throw a loss of $100,000 on the stockholders of this corporation, because they technically failed to perform their contract in the slight and immaterial particular that they did not legally assign a small minority of this stock.

In the statement in this opinion that the defendants received and retained all the substantial benefits of this contract, we have not overlooked the contention of counsel for the defendants that the letter of their counsel on September 12, 1891, constituted an offer to return the certificates and assignments of the stock, and should, in law, have the effect of their redelivery. That letter was, in substance, a refusal to pay the purchase price for frivolous reasons, one of which was that the assignments were not made in time, because, although they were delivered before April 27, 1891, some powers of attorney and instruments of further assurance of title were, at the suggestion of the counsel for De La Vergne, forwarded to him two days later, and a statement that, if his views were correct, he was ready to pass over the papers which he and De La Vergne had received to whomsoever was legally entitled to the custody of the same, which, he wrote, was a question he was unwilling to decide. It is not easy to see how this letter was an offer to return anything. It was an offer to deliver papers to some one on condition that his views were correct; but his views were not correct. The stipulation in the contract for a delivery of the assignments within 10 days from its date was for the benefit of the defendants, and when their counsel, after the expiration of the 10 days, and after the assignments were delivered, pointed out certain objections to them, and suggested that these objections should be remedied by instruments of further assurance, and the stockholders of the Consolidated Company complied with his suggestion, and forwarded these instruments within two days, and no further objection was made to the sufficiency of their performance of the contract until September 12, 1891, that was a waiver of the objection that these instruments were not delivered in time, if, indeed, it was not a waiver of every objection to them. Raymond v. Water Co., 4 C. C. A. 89, 53 Fed. 883; Wilcoxson v. Stitt (Cal.) 4 Pac. 629; Smith v. Mohn (Cal.) 25 Pac. 696; Kelly v. Berry, 39 Wis. 669, 672; Smith v. Pettee, 70 N. Y. 13, 17; Morgan v. Herrick, 21 Ill. 481; Irvin v. Gregory, 13 Gray, 215; Knox v. Schoenthal (Sup.) 13 N. Y. Supp. 7, 8. Moreover, an offer to deliver these papers to the unknown person who was legally entitled to them was not an offer to deliver them to the stockholders of the Consolidated Company. The person entitled to them was De La Vergne. Further, an offer to return them on September 12, 1891, if sufficient in form, would have been an idle ceremony. The defendants had undoubtedly then derived all the benefits of a performance of the contract by the Consolidated Company and its stockholders

that they could ever derive. They still held the right to its assets, subject to its debts, the good will of its business, and the covenant of its stockholders which suppressed its competition. No doubt they had secured its customers, and destroyed all possible competition. The return to the stockholders of the control over the empty shell of their corporation would have been a useless act. A merchant cannot, by offering to return the empty box, successfully defend an action for the purchase price of a box of goods, on the ground that the box was defective, when he has received and sold the goods. The purchaser of a note and a mortgage securing it cannot, by offering to reassign the mortgage, after he has collected and surrendered the note, successfully defend an action for the purchase price, on the ground that the assignment of the mortgage to him was defective. And the defendants could not, after receiving and retaining for three months the right of this corporation to its assets, subject to its debts, and the good will of its business, and, after destroying its competition, by offering to return the control of the corporation shorn of its property and rights, defeat the action for the price they agreed to pay because they had not received legal assignments of a minority of its stock.

The contention that this action for the specific performance of this contract cannot be maintained, under the decisions in Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12; Hoare v. Rennie, 5 Hurl. & N. 19; Bowes v. Shand, 2 App. Cas. 455; Honck v. Muller, 7 Q. B. Div. 92; Reuter v. Sala, 4 C. P. Div. 239; and like cases,—until the plaintiff proves a complete and technical performance of the contract on the part of the Consolidated Company and its stockholders, has not escaped consideration. The distinction between those cases and the case at bar is that the defendants in the former had not received and retained anything under the contracts for which they had not paid the contract price, while the defendants in this case have received and retained all the benefits of a substantial performance of the contract, and have paid nothing. Those were actions for the purchase price of goods, no part of which had been accepted and used by the defendants without paying therefor. This is an action for the purchase price of property and rights which the defendants have received and enjoyed the benefits of. The distinction is clearly pointed out by the circuit court of appeals of the Third circuit in Clark v. Steel Works, 3 C. C. A. 600, 53 Fed. 494, 498, where that court justly remarks:

"If the defendants in Norrington v. Wright had retained and used the railroad iron delivered to them after they had discovered the seller's failure to ship the stipulated quantities in February and March, they would not have been justified in rescinding their contract."

This distinction is noted by Mr. Justice Gray in the opinion in Norrington v. Wright, where he says:

"This case wholly differs from that of Lyon v. Bertram, 20 How. 149, in which the buyer of a specific lot of goods accepted and used part of them with full means of previously ascertaining whether they conformed to the contract."

The case at bar is not ruled by Norrington v. Wright and like cases, but falls within the principle announced at the opening of this opinion, and is governed by Lyon v. Bertram and other cases cited in support of it.

If it is said that the defendants were not aware that the assignments made by the executors and trustees were not authorized by orders of the probate court, and hence that they were excused from rejecting them and returning the property which they had received, the answer is that it was as easy for them to ascertain that fact in May and June of 1891, when these parties could have been placed in statu quo, as it was on April 10, 1893, after they had derived all the benefits of the contract, when they first raised the point by their answer in this case. Moreover, the rule caveat emptor governed them. They knew the law. They had notice of all the facts that the diligent inquiry of a reasonably prudent man would have discovered, and they had reserved to themselves by the contract 60 days after the assignments were delivered to examine them and decide upon their sufficiency before they were required to pay. The fact that the assignments were executed by executors and trustees was notice sufficient to cast upon them the duty to investigate the authority of these officers, to object to it if insufficient, and to return the property they had received within the 60 days provided by the contract, or to forever after hold their peace. They could not lawfully refuse to investigate this question until they had appropriated to themselves all the benefits of the contract, and made it impossible for them to restore the Consolidated Company to its original situation, and then for the first time make the investigation, and repudiate their obligations under the contract.

The judgment below must be reversed, and the cause remanded, with directions to grant a new trial, and it is so ordered.