## CRANE CO. v. COLUMBUS CONST. CO.

(Circuit Court of Appeals, Seventh Circuit. May 4, 1896.)

### No. 268.

1. EVIDENCE—ADMISSIBILITY AND WEIGHT—TESTING QUALITY OF GOODS SOLD.

Where gas piping sold was guarantied to stand a certain pressure when tested in line, *held*, that evidence of tests made in line was admissible, even if they were made without notice to the seller, and not within a reasonable time after delivery, these facts going merely to the value, and not to the competency, of the evidence.

2. SAME—OPINION EVIDENCE.

Upon a controversy over the quality of gas pipe guarantied to stand a certain pressure in line, where it is claimed by the seller that the pipe was injured in handling and laying, after delivery, witnesses who supervised or participated in the work may testify that, in their opinion, the workmen were skillful; but the general question whether the line of pipe was laid with proper skill and care is not one to be determined upon the opinions of witnesses.

3. SAME—COMPETENCY—ESTIMATES FROM INSUFFICIENT DATA.

In an action to recover damages for failure of gas pipe to stand the guarantied pressure when laid in line, the purchasing company sought to recover the cost of taking up and relaying the pipe with stronger collars; but it appeared that the work was done by employés who were carrying on other work at the same time, and that no separate account was kept of the labor and expense. *Held*, that it was not competent for a manager of the company to testify to the cost per foot of the work, where his estimates were made without personal knowledge of the facts, from reports not designed for the purpose, and containing no data enabling him to reach a definite conclusion.

4. SAME—BREACH OF WARRANTY—REPAIRS BY PURCHASER.

A construction company, under contract with a natural gas company to furnish and lay a pipe line, made a contract with a supply company, whereby the latter was to furnish piping guarantied to stand a working line pressure of 1,000 pounds to the square inch. Thereafter an act of legislature was passed prohibiting the transportation of natural gas under more than natural pressure, or an artificial pressure of 300 pounds. Thereupon the contract between the gas company and the construction company was modified so as to require the piping to stand a test in line of only 400 pounds. Prior to the enactment, some of the pipe furnished by the supply company had been laid, but was found incapable of standing the guarantied pressure of 1,000 pounds. It was claimed, however, by the supply company, that it was sufficient for a working pressure of 300 pounds, and there was evidence tending to support the claim. Nevertheless, the construction company, after the enactment, took up and relaid the pipe with stronger collars, also cutting the threads anew, at great expense, and sought to recover the same from the supply company. *Held*, that the supply company was entitled to an instruction that, if the piping was otherwise in accordance with the specifications of its contract, and, as first laid, was sufficient to stand a working pressure of 300 pounds, as limited by law, and if the construction company unreasonably and unnecessarily expended money in making the change, for the alleged purpose of constructing a line to withstand a pressure of 1,000 pounds, then the supply company was not liable therefor; and that, under such circumstances, the ordinary rule should prevail, and the recovery be on the basis of the difference in value between the article delivered and that contracted for.

5. SAME—REPUDIATION OF CONTRACT IN PART — ACTION TO ENFORCE IN PART.

A purchaser of gas pipe to be delivered at times and places to be designated by it, after partial delivery, refused to receive more, alleging that the seller had failed to make deliveries for some time. It appeared, however, that no time or place had been designated by it for such deliveries.

Afterwards the purchaser brought an action for breach of the warranty of quality, in respect to the pipe previously furnished. *Held*, that the seller was entitled to an instruction that, if there was nothing to justify the termination of the contract by the purchaser, it could not maintain its action for a breach thereof by the seller.

**6.** SAME.

The vendee under a contract of sale which is executory and entire cannot repudiate it in respect to a part of the goods, and at the same time enforce it in respect to the remainder.

In Error to the Circuit Court of the United States for the Northern District of Illinois, Northern Division.

This was an action by the Columbus Construction Company against the Crane Company to recover for alleged breach of a contract of sale. The circuit court sustained demurrers to the declaration, and, plaintiff declining to amend, judgment was rendered for defendant. On appeal to this court, that judgment was reversed, and the cause remanded for further proceedings. 3 C. C. A. 216, 52 Fed. 635. Afterwards a trial was had before a jury, resulting in a verdict and judgment for plaintiff in the sum of $48,000, and defendant brings the case here on writ of error.

Edwin Walker and Chas. S. Holt, for plaintiff in error.

Geo. Hunt and S. S. Gregory, for defendant in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge. For the entire contract between the parties to this appeal, and for the construction put upon it by this court when the case was first here, reference is made to the opinion in Columbus Const. Co. v. Crane Co., 3 C. C. A. 216, 52 Fed. 635, and 9 U. S. App. 46. After the case had been remanded, further counts, special and common, were added to the declaration; but, while the breaches of warranty relied upon and the damages claimed were stated more specifically and fully, the character of the action was not changed.

The defendant in error, the Columbus Construction Company, a corporation of New Jersey, on the 5th day of June, 1890, entered into a contract with the Indiana Natural Gas & Oil Company (which was incorporated under the laws of Indiana for the purpose of owning and operating a pipe line for the transportation of natural gas from the gas fields of Indiana to Chicago), whereby the Columbus Company undertook to construct the proposed line; and to that end, on June 20, 1890, it made with the Crane Company (the plaintiff in error) the contract in suit, whereby the latter company undertook to purchase, and to cause to be delivered to the former, the various quantities and sizes of pipe necessary for the completion of the line, including 260 miles of 8-inch pipe concerning which this controversy has arisen. The substance of the contract, in so far as it need be stated here, is that the pipe shall be "8-inch wrought-iron standard line pipe, to weigh not less than 27.48 pounds per lineal foot," "made from soft iron, free from blisters and other imperfections, and guarantied to stand a working line pressure of one thousand pounds to

the square inch when proved and tested in lines"; that each spliced joint shall weigh the weight of the collar in addition to its own required weight; that each joint of pipe shall have eight threads to the inch, and at least two inches of thread on each end, with a full uniform taper to the threads both on the pipe and in the collar; and that the vendor shall pay to the vendee all damages and expenses sustained by reason, of defects in the pipe delivered, up to and including the time when the pipe should be tested by the vendee under working pressure, not in excess of one thousand pounds to the square inch, and proved tight in line, which working test should be made with reasonable promptness. Deliveries were to be made at such places as should be designated by the Columbus Company, at the earliest practicable dates, in July, August, and September, and of the 8-inch pipe not less than 37 miles in July, 123 miles in August, and the remainder in September, 1890, "barring strikes and causes beyond control." The Columbus Company, upon the delivery of each invoice at the point by it designated, was to pay "spot cash" therefor, including a commission of $2\frac{1}{2}$ per cent. over the amount of the manufacturer's invoice. Shipments were to be by car loads, not exceeding five spliced joints, the Crane Company paying freight and other charges of transportation from the mills to the points of destination; and it was agreed finally that the pipe should not be construed to be accepted, by reason of any payments made therefor, so as to relieve the Crane Company from liability on account of its defective character, until the same had been laid and tested in line, and proved.

In pursuance of this contract, the Crane Company made contracts with different companies for the manufacture and shipment of the required pipe, and reported the same for approval to the Columbus Company. The first shipment, amounting to about 12 miles, was delivered, by order of the Columbus Company, to the Consumers' Gas Company, at Chicago, but was not used until two years later, when it was shipped to Indiana, and laid in line. In addition, by November 3, 1890, 8-inch pipe had been delivered at different stations along the line, to the amount of 95.14 miles, of which 5.7 miles were laid in or across the Tolleston Marsh, 1 mile was laid at the Kankakee Marsh, and 12.65 miles, in double lines of half that length, were laid at Deep River. Further deliveries were then suspended by agreement or mutual consent, until more adequate appliances for testing the pipe in line could be obtained; the tests made in September, 1890, at Deep River, with an air pump of a capacity of 110 pounds to the square inch, having developed serious leaking at as many as 10 per cent. of the joints, and "more at the mill end than at the field end." Besides conflicting views of the contract liabilities of the parties, which were settled only by the decision of this court referred to, the agents of the parties who were present at the tests differed in respect to the nature and cause of the defects in the joints; it being claimed on behalf of the plaintiff in error that the pipe was all tested at the mills, and, without leaking, stood a pressure of 1,000 pounds to the inch, and that the defects developed

in line were attributable to rough and careless handling and unskillful laying of the pipe. On the contrary, the representatives of the defendant in error asserted a careful and skillful manipulation and laying of the pipe, and, in the first instance, attributed the defects to the light weight of the collars, by reason of which they expanded under pressure, but the subsequent employment of heavier collars did not cure the defects; and the later conclusion seems to have been reached that the threads on the ends of the pipe and in the collars did not have a full and uniform taper, the fault being in the thread of the collar. During the ensuing October, efforts were made, by caulking and otherwise, to tighten the defective joints, and, up to a pressure of 200 pounds, were perhaps substantially successful; but, about the 28th of that month, high pressure pumps were brought into use, which, at a pressure of 400 pounds, reopened some of the old leaks, and disclosed many new ones. Further attempts were then made, by caulking and other means, to remedy the defects, but with unsatisfactory results, until November 15th, when winter set in, and work was stopped.

On the other hand, while there had been delays in the delivery of pipe, the Columbus Company had not paid in full for the pipe delivered; and on September 29th the shortage had risen to $139,900, but by later payments, (he last of which, in the sum of $15,000, was made November 26th, the deficiency was reduced to $73,800. These shortages were the subject of correspondence, and of complaint by the Crane Company, in behalf of which it is claimed that, while various excuses were offered, it was never assigned "as the reason for not paying spot cash that the pipe was not satisfactory"; that complaint was once made by Mr. Yerkes, who, in October, had succeeded Mr. Hequembourg as the representative of the Columbus Company in the transaction, that some of the pipe shipped by the Reading Company had been forwarded in a damaged condition, but that, it having been found on investigation that some of the threads had been jammed in transit, the Crane Company offered to have all damaged pipe put in order, and returned to the place of use, at its own expense, and that nothing was said at any time about a deficiency in the weight of the collars, or about any defect other than jammed threads; that on December 31, 1890, Mr. Yerkes offered in writing to accept the proposition for repairing pipe, and to pay therefor when returned and further inspected, but upon condition that the mills should commence delivery of pipe, to fill the balance of their contracts, on February 1, 1891, and that the contract be modified so that, instead of spot cash for all pipe delivered, 50 per cent. of the price should be paid on delivery, and the remainder after a test in line, under a pressure of 1,000 pounds to the square inch; that the Crane Company refused to accede to this change in the terms of payment, and now contends that its proposition to repair the damaged threads was thereby in effect rejected by Yerkes. This difference, it seems, divided the parties until January 30, 1891, when Mr. Yerkes telegraphed the Crane Company:

"We are prepared to receive pipe in accordance with contract, particularly that part which provides for a test of 1,000 pounds when laid. Although

you have not complied with terms of your contract, we will receive pipe if you commence immediate delivery."

—And, receiving no response, on February 12, 1890, wrote as follows:

"On the 30th ult., I telegraphed you from New York as follows: 'We are prepared to receive pipe in accordance with contract, particularly that part which provides for a test of one thousand pounds when laid. Although you have not complied with terms of your contract, we will receive pipe if you commence immediate delivery.' Up to the present time, I understand, you have had no pipe delivered this year. I wish to notify you that we cannot wait longer for the said delivery, and will therefore cancel our contract. In regard to the pipe that has already been delivered, we are prepared to make some arrangement with you respecting the repair of same, and adjusting the accounts now remaining open.
."[Signed]                    Chas T. Yerkes, Vice Prest., C. C. Co."

To that letter, the Crane Company on the same day responded as follows:

"Your young man brought in yours of even date a few minutes ago, and upon its receipt it struck me that there was no occasion for any reply in view of all that has been said and written, but have since concluded that we had better make answer, in order that we may keep our record straight. Would say that we answered yours of January 30th, from New York, to the effect that we were prepared to go ahead with your pipe line contract on the conditions of said contract, and we are now prepared to do so.     But you have persistently requested that we go ahead on the contract upon terms different from the contract, and this we have persistently refused, and now refuse, to do. We have simply demanded that you carry out your part of the contract, and desire now to notify you that, if you cancel this contract, you do so at your peril, and we will hold you responsible for the results. We have not delivered any of the pipe this year, because you have not asked us to deliver it, and because you have not complied with your part of the contract. We have been, as we are now, awaiting your orders to go on with the contract, and will do so when you comply with your part of the contract.
    "[Signed]                    Crane Company,
                              "R. T. Crane, Prest."

In the following March, Mr. Hequembourg resumed charge, and reaching the conclusion, after some further tests, that the collars furnished by the Crane Company were too light, procured heavier collars, at an expense for those used upon the Crane Company's pipe of $104,000, and proceeded to lay the line, using the Crane pipe so far as it went; the total extra expense alleged to have been incurred in making that pipe available being the sum of $200,000, most of which the plaintiff in error insists was incurred by reason of the false theory, negligently adopted and pursued, that the Crane collars were too light. The line was finished and turned over to the Indiana company late in 1892. The defective taper in the threads of the collars, it is asserted by the plaintiff in error, was not discovered until just before the trial of this case, which was commenced December 3, 1894, and therefore could not have been the ground for the rejection of the pipe. The suit was commenced May 23, 1891, the declaration being framed as "of a plea of trespass on the case upon promises," and charging, in substance, that the pipe was made of imperfect iron, and was incapable, when tested in line, of standing the required pressure, and that the threads upon the pipe and in the collars did not have a uniform taper. The plaintiff in error

tendered the general issue, with notice of special matter. The trial resulted in a verdict and judgment in the sum of $48,000 for the defendant in error. Numerous errors are assigned, but the questions to be considered are comparatively few.

Evidence of certain tests made of the pipe in line was admissible to show the quality and value of the pipe delivered as compared with that contracted for; and if the tests were made without notice to the plaintiff in error, and not within a reasonable time after delivery of the pipe, the value, but not the competency, of the testimony, was affected by those circumstances.

Upon the question whether the pipe was handled carefully and properly laid, witnesses who supervised or participated in the work were permitted to testify that, in their opinion, the workmen were skillful, and the work well done. It was competent, we think, to show that men of experience and skill were employed upon the work; and doubtless, in such a case, a witness may be required to state what defect, if any, he saw in the work, or what carelessness or lack of skill in the manner of its execution; but the general question whether the line or lines of pipe in question had been laid with proper skill and care was not one, we think, to be determined upon the opinions of witnesses. Among the cases cited touching the point are Provision Co. v. Baier, 20 Ill. App. 376; Railroad Co. v. Clark, 108 Ill. 113; Morris v. Town of East Haven, 41 Conn. 252; Turnpike Co. v. Coover, 26 Ohio St. 520.

A more serious question has arisen upon the admission of testimony to show the cost of taking up, repairing, and relaying of pipe at Deep River, Tolleston, and Kankakee. Proof was made that in 1891 and 1892, after the bringing of this suit, the Columbus Company, having determined to make use of the pipe which had been delivered, took up what had been laid, removed the Crane collars, rethreaded such pipe as had been bent or caulked, put on heavier collars, and relaid the pipe where it had been before. The men employed in doing this work were at the same time engaged in other work, and no separate account was kept of the labor and expense incident to the changing of the collars, and rethreading and relaying of the pipe received of the Crane Company. The excuse offered is that it could not be done with economy. On direct examination, Mr. Hequembourg, testifying for his company, stated that the cost per foot of taking up and relaying the pipe was $1.50 at Tolleston, 75 cents at Deep river, and at Kankakee $1. The cross-examination showed that these were mere estimates, prepared without personal knowledge of the facts, from reports which were not designed for the purpose, and contained no data to enable him to reach a definite and just conclusion. These estimates were clearly incompetent. They were mere guesses by a witness interested to make the figures large. He testified that it was his "particular business to ascertain what was a fair amount to charge the defendant for changing the collars and reconstructing the line"; and, that being so, he should have kept, or caused to be kept, accurate and distinct accounts of the labor and expense as the work progressed, and should not have been allowed to give to the jury, as the result of a calcula-

tion the basis of which was not shown, the very large sum mentioned, and then to testify, as he did, that that sum was the reasonable cost of the several items included in the estimate. Such evidence does not become competent, under ordinary circumstances, because better evidence may not be at hand.

Error is also assigned upon the exclusion of evidence offered by the plaintiff in error for the purpose of showing that useless and unreasonable expense had been incurred by the defendant in error in its efforts to make the pipe conform to the specifications, fulfill the conditions, and stand the tests required by the contract. The Columbus Company was engaged in laying a pipe line, not directly for its own use, but for the Indiana Company, with which it had made the contract of June 5, 1890. By an act of the Indiana legislature approved March 4, 1891, regulating the mode of procuring, transporting, and using natural gas, the use of more than natural pressure or an artificial pressure exceeding 300 pounds to the square inch was forbidden; and by a decision of the supreme court of that state, handed down June 20, 1891, the act had been declared constitutional. Jamieson v. Oil Co., 128 Ind. 555, 28 N. E. 76. The defendant in error and the Indiana Company were joint parties to that suit, and, as a result of the decision, they modified their contract so as to require the pipe and collar to be tested at the mill under 1,000 pounds hydraulic pressure, and, when laid, to stand, for 24 consecutive hours, a working pressure of 400 pounds to the square inch, without manifest or material defects, or leakage exceeding 10 per cent. of its total storage capacity; the tests to be made in five-mile sections, as soon as each section should be completed. The plaintiff in error offered to put the contract and the modification in evidence, and asked the court to give to the jury, at the proper time, an instruction which, after referring to the Indiana statute and other relevant and undisputed facts, proceeded as follows:

"If, therefore, the jury find from the evidence that the pipe delivered to the plaintiff by the defendant under its contract, prior to the commencement of this action, was of sufficient structural strength to stand a working line pressure of three hundred pounds to the square inch, and also that the threading and taper conformed to the specifications of the contract, so that the line, when constructed, was sufficient for the transportation of the gas at the pressure of three hundred pounds, as limited by law; and if you further believe that, after the commencement of this action, the plaintiff unreasonably and unnecessarily expended money in the purchase of new couplers, and exchanging such new couplers for the old, for the alleged purpose of constructing a line that would stand a pressure of a thousand pounds to the square inch; and if you further believe from the evidence that such expenditure was unreasonable and unnecessary,—then the court instructs you that you should not find for the plaintiff as damages the amount of money so expended."

We are of the opinion that the evidence should have been admitted and the instruction given. By the general rule governing the measure of damages for a breach of warranty in the sale of chattels, the defendant in error, having paid the entire purchase price, was entitled to reclaim a sum equal to the difference in value between the pipe delivered and pipe of the quality warranted; and if, at the time

of delivery, it remained necessary or desirable, and was practicable, by a reasonable expenditure, to bring the pipe up to the requirements of the contract, it was the privilege of the defendant in error to make the expenditure necessary for that purpose, and to exact reimbursement of the Crane Company, instead of resorting to the proof of comparative values. But if, as the proposed instruction assumes, the pipe met the requirements of the modified contract with the Indiana Company, and, by reason of the Indiana statute, a pipe capable of bearing a pressure of more than 300 pounds was not needed, then, manifestly, it was unreasonable to expend time or money in an effort to impart to the pipe a degree of strength which could be of no practical utility. Under such circumstances, the ordinary rule should prevail, and the recovery should be on the basis of the difference of value between the article delivered and that which ought to have been delivered,—to be determined by the market prices, or, if that should be impracticable, then, probably, by the difference in cost of production at the mills; certainly not by the cost of repair or reconstruction in or along the trenches in which the pipe was to be laid, where necessarily the work would be more difficult and expensive than at the mills. The instruction asked was hypothetical, leaving to the jury to determine whether the facts were as supposed, and whether the expenditures in question were reasonable, and, if the modified contract with the Indiana Company had been admitted in evidence, the instruction would have been pertinent and proper to be given. The statute of Indiana, and the decision of the supreme court of that state whereby it was declared constitutional, were matters of judicial cognizance, in respect to which formal proof was unnecessary. Among the authorities cited touching the measure of damages in such cases, besides the texts of Parsons, Sedgwick, Sutherland, and Addison, are the following: Marsh v. McPherson, 105 U. S. 716; U. S. v. Behan, 110 U. S. 339, 4 Sup. Ct. 81; Blacker v. Slown, 114 Ind. 322, 16 N. E. 621; Smith v. Dunlap, 12 Ill. 184; Miller v. Mariners' Church, 7 Me. 51; Le Blanche v. Railroad Co., 1 C. P. Div. 286; Hamilton v. McPherson, 28 N. Y. 72; Frick Co. v. Falk (Kan. Sup.) 32 Pac. 360; Loomer v. Thomas (Neb.) 56 N. W. 973; Lake Co. v. Elkins, 34 Mich. 439; Bradley v. Denton, 3 Wis. 557; Dillon v. Anderson, 43 N. Y. 231; Muller v. Eno, 14 N. Y. 597; Passinger v. Thorburn, 34 N. Y. 634; King v. Barnes, 109 N. Y. 267, 16 N. E. 332; Fisk v. Tank, 12 Wis. 276; Brown v. Bigelow, 10 Allen, 242; Medbury v. Watson, 6 Metc. (Mass.) 246.

But the question which is most earnestly disputed is whether, in respect to the pipe delivered and retained, the defendant in error, by reason of its refusal, in the letter of February 12, 1890, to accept further deliveries under the contract, is debarred of the right to sue for a breach of the warranty of quality. It is insisted that the refusal to accept more pipe was justified by the bad quality of that received, the presumption being under the circumstances that further deliveries, coming from the same mills, would be of the same bad quality. That was a question of fact, which, if the evidence was sufficient, should have been left to the jury; but it is to be ob-

served that the refusal was not put upon that ground, but on the ground that no pipe had been delivered recently, though no order or request, with a designation of the place for such delivery, had been made. On the facts as presented in the briefs, beyond which we have not looked, it does not appear that there was an adequate excuse for the refusal to accept further performance of the contract; but, whether there was or not, it was the right of the plaintiff in error to have the case submitted to the jury upon the hypothesis that nothing had been done to justify a termination of the contract by the defendant in error; and on that basis, whether other modes of relief were available or not, we think it clear that the defendant in error can have no remedy in an action upon the contract. It cannot at one and the same time repudiate an executory contract like this in respect to a part of the subject-matter, and in respect to other parts insist upon its enforcement. If the declaration had disclosed such a breach or unexcused repudiation of the contract by the plaintiff, it would have been plainly demurrable. Only upon the theory that the Crane Company had been guilty of a breach or breaches which justified the other party in refusing further performance was the action maintainable as brought; and yet from the damages which the jury was directed to award the plaintiff, on account of the defective quality of the pipe delivered, a deduction was authorized of the amount of commission which that company would have earned if it had been permitted to deliver the remainder of the pipe, and a further deduction on account of a decline in the market price of pipe. If the conduct of the Crane Company was such as to justify a refusal of the other party to receive further deliveries, it was entitled to no profit thereon by way of commission or otherwise (U. S. v. Behan, 110 U. S. 339, 4 Sup. Ct. 81); and just as if the contract had been terminated by agreement, or as if the pipe delivered had been the total amount called for by the contract, the Columbus Company was entitled to recover undiminished damages, equal to the difference in value between the pipe delivered and pipe of the stipulated quality.

It is not a case of rescission. That requires the placing of both parties in statu quo, and in this case would have involved a return, or at least a tender back, of the pipe which had been received. Neither is it a case of refusal to receive particular lots of pipe, offered for delivery, because the same was visibly, or, upon immediate inspection, was found to be, defective. The rejection of such pipe, before placing it in line, would not have been an act either of rescission or repudiation, but rather of enforcement of the contract. Barrié v. Earle, 143 Mass. 1, 5, 8 N. E. 639; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12; Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69. But upon the hypothesis of the proposed instruction, which, together with the evidence offered in support of it, ought, as we think, to have been submitted to the jury, it is simply a case where, under a contract of sale which is executory and entire, the vendee repudiates the contract in respect to a part of the goods, and in respect to the remainder seeks to enforce it,—a proposition which, we believe, is supported neither by reason nor precedent. The earlier cases touch-

ing the general subject, both English and American, are collected in the notes to Cutter v. Powell, 2 Smith, Lead. Cas. 17–53; and while, in some respects, there has been a contrariety of ruling, no case has been cited which is perceived to be inconsistent with our present conclusion. The case of Norrington v. Wright, supra, was not in fact a case of rescission, though partially so treated. It was a suit by the vendor, seeking damages of the vendees on account of their refusal to accept consignments of old T rails, which, by the contract, were to be shipped 1,000 tons per month, to the total number of 5,000 tons. The vendees accepted and paid for 400 tons, received in one consignment, but afterwards, learning that the quantities shipped during three months did not correspond with the requirement of the contract, refused to accept or pay for any more. The court held the contract to be entire, and the specification of the quantity to be delivered each month to be descriptive of the goods, a departure from which through three months "justified the defendants in rescinding the whole contract, provided they distinctly and seasonably asserted the right of rescission"; and their retention of the 400 tons received in February, it was said, "was no waiver of this right, because it took place without notice or means of knowledge that the stipulated quantity had not been shipped in February. The price paid by them for that cargo being above the market value, the plaintiff suffered no injury by the omission of the defendants to return the iron; and no reliance was placed on that omission in the correspondence between the parties." To make that case like this, on the theory of rescission, it is necessary to reverse the parties, and to suppose that the vendees, after receiving and paying for the 400 tons shipped in February, had learned at once that no more had been shipped during that month, and having on that account refused to receive further consignments, even though offered in conformity with the contract, had brought suit for damages for the failure of the vendor to ship 1,000 tons in February, instead of the 400 tons received and retained. If that had been the case, it would hardly have been said that the keeping of the 400 tons was not a waiver of the right of rescission. The case is expressly distinguished from Lyon v. Bertram, 20 How. 149; and the proposition is announced, which alone and independently of the doctrine of rescission was sufficient to dispose of the suit, that "the plaintiff, denying the defendant's right to rescind, and asserting that the contract was still in force, was bound to show such performance on his part as entitled him to demand performance on their part, and, having failed to do so, cannot maintain this action." The principle of that proposition is applicable here. Having repudiated the contract in part, the defendant in error had no right to ask its enforcement in another part. See Clark v. Steel Works, 3 C. C. A. 600, 53 Fed. 494, and 3 U. S. App. 358. In Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69, the contract was for the sale of 500 tons of American iron and 300 tons of Scotch iron, which the seller undertook to ship to the buyer. The controversy was concerning the American iron alone, which, after delivery at Milwaukee, the purchaser refused to accept, on the ground that it was not of the grade called for by the contract, and, having

notified the seller that the iron was held subject to his order, brought suit to recover the price which had been paid for the iron and the freight thereon. The point decided was that, the jury having found that the iron was not of the quality which the contract required, "on that ground the defendant in error, at the first opportunity, rejected it, as he had a right to do." The syllabus couples, with the right to reject, the right to "rescind the sale," but that is taken from the court's statement of a general proposition of law in respect to sales by sample. When the entire subject of a contract of sale is rejected, it amounts to a rescission of the contract; but when a part of the subject is accepted, and another part rejected, because not of the quality contracted for, it is not a rescission. In Pope v. Allis it does not appear whether or not the Scotch iron included in the contract was received by the purchaser. If not, then the case was, as it seems to have been treated, the same as if the American iron alone had been the subject of the sale, and the rejection of the iron was a rescission; but, if the Scotch iron was received and retained, it was not a rescission, but simply a rejection of the American iron, on the ground stated, that "the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted"; just as the defendant in error here was not bound to receive a shipment of pipe which was visibly below the contract standard, though the test provided for was to be made when the pipe was in line. But, under this contract, the vendor would have had the right, within a reasonable time, to furnish, in lieu of pipe so rejected, other pipe of the required quality; while in the case of Pope v. Allis such right of substitution was not contemplated, and probably did not exist. In German Sav. Inst. v. De La Vergne Refrigerating Mach. Co., 17 C. C. A. 34, 70 Fed. 146, the rule that rescission must be total is strongly stated, and numerous authorities are cited. Many cases have been cited which afford little aid to the decision of this one, because they grew out of completed deliveries, and involved no question of partial or imperfect performance by the party who was seeking a remedy upon the contract. In Cherry Valley Iron Co. v. Florence Iron River Co., 12 C. C. A. 306, 64 Fed. 569, the contract, which was for the sale of a quantity of ore to be delivered and paid for monthly, is broadly distinguished from the present contract by the single provision that, if the purchaser failed to pay as agreed, the seller should have the right to cancel the contract in respect to ore not delivered at the time of the default in payment.

The judgment below is reversed, and the cause remanded, with instruction to grant a new trial.