COLUMBUS CONST. CO. v. CRANE CO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1900.)

No. 548.

1. APPEAL—PRESUMPTIONS—AMENDMENTS TO AVOID VARIANCE.

There should be a liberal practice in allowing amendments of notices of special matter of defense or counterclaim accompanying a plea of the general issue in an action of assumpsit, and on appeal or error any amendment necessary to avoid a variance, and which might have been permitted had objection been taken in the trial court, will be regarded as having been made.

2. SAME—REVIEW OF INSTRUCTIONS—SUFFICIENCY OF EXCEPTIONS AND ASSIGNMENTS OF ERROR.

Rules 10 and 11 of the circuit court of appeals (31 C. C. A. cxlv., 90 Fed. cxlv.), which require that a party excepting to a charge "shall state distinctly the several matters of law to which he excepts," and "shall specify separately and particularly each error asserted and intended to be urged," are for the purpose of preventing the presentation for review of any question which has not been considered by the trial court; and, while the court will not needlessly embarrass the practice by requiring an overnice observance of them, they must be observed to the extent necessary to accomplish that purpose, and only such objections to a charge will be considered as were sufficiently disclosed by the exceptions taken to bring them to the attention of the trial court.

3. CONTRACTS—CONSTRUCTION.

While parties to a contract are entitled to its literal performance, when practicable, that does not mean that courts and juries shall give to the terms of a contract, however clear and unmistakable the ordinary significance of the words employed, a meaning which, when applied to the subject-matter of the contract, will render performance impossible; and a provision of a contract to furnish pipe, and collars for uniting the same, to be used in the construction of a line for piping gas, that the pipe should prove tight in line, cannot be literally construed, where the evidence shows that the construction of an absolutely tight line for such use is impossible.

**4.** EVIDENCE—DEFECTS IN ARTICLES SOLD—TESTS DURING TRIAL.

Where collars for joining iron pipe, furnished by defendant under a contract, were produced in court by plaintiff, evidence is admissible to show the result of tests of such collars made by defendant pending the trial, in respect to defects therein alleged by plaintiff.

**5.** SAME—DEMONSTRATIVE EVIDENCE—COLLATERAL FACTS.

A court may, in its discretion, exclude evidence of tests made of articles similar to those furnished under a contract, and alleged to have been defective; such evidence being collateral, and not directly pertinent to any issue in the case.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

This case is here the third time. It was here first on demurrer to the declaration (Columbus Const. Co. v. Crane Co., 9 U. S. App. 46, 3 C. C. A. 216, 52 Fed. 635); and the second time after a trial upon the merits, which resulted in a verdict and judgment for $48,000 in favor of the plaintiff, the present plaintiff in error. The last judgment was in favor of the defendant, the Crane Company, on its counterclaim, for $98,085.94, the amount of the unpaid balance at the contract price for pipe delivered, less eight or nine hundred dollars. The entire contract will be found in our first opinion. The substance of it, to quote from our second opinion, is that: "The Columbus Construction Company, a corporation of New Jersey, the defendant in error, on the 5th day of June, 1890, entered into a contract with the Indiana Natural Gas & Oil Company, which was incorporated under the laws of Indiana for the purpose of owning and operating a pipe line for the transportation of natural gas from the gas fields of Indiana to Chicago, whereby the Columbus Construction Company undertook to construct the proposed line; and to that end on June 20, 1890, it made with the Crane Company, the plaintiff in error, the contract in suit, whereby the latter company undertook to purchase, and to cause to be delivered to the former, the various quantities and sizes of pipe necessary for the completion of the line, including two hundred and sixty miles of eight-inch pipe, concerning which this controversy has arisen. The substance of the contract, in so far as it need be stated here, is that the pipe shall be 'eight-inch, wrought-iron, standard line pipe, to weigh not less than 27.48 pounds per lineal foot,' 'made from soft iron, free from blisters and other imperfections, and guarantied to stand a working line pressure of one thousand pounds to the square inch when proved and tested in lines'; that each spliced joint shall weigh the weight of the collar in addition to its own required weight; that each joint of pipe shall have eight threads to the inch, and at least two inches of thread on each end, with a full, uniform taper to the threads both on the pipe and in the collar; and that the vendor shall pay to the vendee all damages and expenses sustained by reason of defects in the pipe delivered, up to and including the time when the pipe should be tested by the vendee under working pressure not in excess of one thousand pounds to the square inch, and proved tight in line, which working test should be made with reasonable promptness. Deliveries were to be made at such places as should be designated by the Columbus Construction Company, at the earliest practicable dates in July, August, and September, and of the eight-inch pipe not less than thirty-seven miles in July, one hundred and twenty-three miles in August, and the remainder in September, 1890, 'barring strikes and causes beyond their control.' The Columbus Construction Company, upon the delivery of each invoice at the point by it designated, was to pay 'spot cash' therefor, including a commission of two and one-half per cent. over the amount of the manufacturer's invoice. Shipments were to be made at such places as should be designated by the Columbus Construction Company, at the earliest practicable dates in July, August, and September, and of the eight-inch pipe not less than thirty-seven miles in July, one hundred and twenty-three miles in August, and the remainder in September, 1890, 'barring strikes and causes beyond their control.' The Columbus Construction Company, upon the delivery of each invoice at the point by it designated, was to pay 'spot cash' therefor, including a commission of two and one-half per cent. over the amount of the manufacturer's invoice. Shipments were to be by car loads not exceeding five spliced joints, the Crane Company paying freight and other charges of transportation from the mills to the point of destination; and it was agreed finally that the pipe should not be construed to be accepted, by reason of any payments made therefor, so as to relieve the Crane Company from liability on account of its defective character until the same had been laid and tested in line and proved."

The declaration contains common and special counts, but all that is alleged of breach of the contract and of damage is believed to be embraced in the

following, quoted from the last special count: "Nevertheless, the said defendant did not perform or regard its promise and undertaking so by it made as aforesaid, in this, to wit, that all of said wrought-iron standard line pipe, when the same was so delivered as aforesaid, was not in conformity with the specifications, and did not fulfill the conditions and stand the tests prescribed in the said contract, and was not made from soft iron, free from blisters and other imperfections, and would not stand a working line pressure of one thousand pounds to the square inch, and would not prove tight in line, when proved and tested in line under said working pressure; and further in this, to wit, that each joint of pipe furnished under said contract did not have eight threads to the inch, and at least two inches of thread on each end, and that full, uniform taper was not given to the threads both on the pipe and in the collar, but, on the contrary thereof, all of said wrought-iron standard line pipe was full of imperfections, and was of a weak, imperfect, poor, and defective quality, and was wholly unable to stand a working line pressure of one thousand pounds to the square inch, or to prove tight in line, when proved or tested in line under said working pressure, and each joint of pipe furnished under said contract as aforesaid had less than two inches of thread on each end, and had more or less than eight threads to the inch, and the taper given to the threads, and each and every of them, both on the pipe and in the collar, was imperfect, partial, and varying,—of all of which the said defendant then and there had notice. And the said defendant, not regarding its said promise or undertaking, did not, nor would it, although often requested so to do, purchase, sell, and deliver to said plaintiff such goods, wares, and merchandise as were required by said contract, but wholly neglected and refused so to do, and therein made default. And said defendant then and there so negligently and improperly conducted and behaved in and about the purchase, sale, and delivery of said goods, wares, and merchandise that the same were by reason thereof not in conformity with the specifications, and did not fulfill the conditions and did not stand the tests prescribed in said contract, but wholly failed therein, and were of no value to the said plaintiff, whereby the said plaintiff not only lost all benefit, profit, and advantage which it might and could have derived and acquired from the purchase, sale, and delivery by the said defendant of the said goods, wares, and merchandise, but was also put to great expense of its moneys, to wit, the sum of $600,000, which was paid by it to the said defendant as and for the purchase price of said goods, wares, and merchandise, and also was compelled to and did necessarily expend a large sum of money in and about the purchase of other goods, wares, and merchandise to supply the place of the insufficient and defective goods, wares, and merchandise so purchased, sold, and delivered by the said defendant as aforesaid, amounting to, to wit, the sum of two hundred thousand dollars over and above the said contract price of the said defective and insufficient goods, wares, and merchandise so purchased and delivered as aforesaid by the defendant; and also necessarily laid out and expended a large sum of money, to wit, two hundred thousand dollars, in and about the taking up of such defective and insufficient pipe so purchased, sold, and delivered by the said defendant as aforesaid, as had been laid in line in the ground, and in and about unscrewing the same, and taking the defective and insufficient collars therefrom, and replacing such collars with other and sufficient collars, and again laying said pipe, and in and about the rethreading and repairing of such portions of said defective and insufficient pipe as it was necessary to rethread and repair in order to make it in those respects of the description, character, and quality provided for in said contract, and in and about the taking the defective and insufficient collars from the other of said insufficient and defective pipe so purchased, sold, and delivered by the said defendant as aforesaid, which had not been laid in line, and replacing said collars with other and sufficient collars, and in and about the loading and hauling to and from the thread mills of such portions of said defective and insufficient pipe as it was necessary to rethread and repair for the purpose aforesaid,—all of which sums of money the plaintiff says were necessarily and reasonably expended in order that the said wrought-iron standard line pipe might conform with the specifications and fulfill the conditions and stand the tests hereinbefore and in said contract set forth; and also sustained great loss and damage on occasion of its not being

able to use the same at Chicago, in the district aforesaid, whereby the said plaintiff, having employed large numbers of men, and secured teams, wagons, tools, and machinery, to lay said pipe for use, was greatly delayed, damaged, and hindered in the prosecution of said work by the said failure of said defendant to comply with its contract in promptly delivering said pipe, and thereby sustained further damage and loss, to wit, in the sum of two hundred thousand dollars, at Chicago, in said district, and has been and is by reason of the premises otherwise greatly injured and damaged."

The plea was a general denial, with notice of special matters of defense, set-off, and a counterclaim to the effect that there was a balance of $150,000 due from the plaintiff to the defendant for pipe delivered in accordance with the contract, and for commission on undelivered pipe; that the plaintiff failed and neglected to lay the pipe properly and to make suitable tests thereof with reasonable promptness; and that though the defendant was at all times ready and willing to perform the contract on its part the plaintiff neglected and refused to perform, and on the 12th day of February, 1891, notified the defendant that it would not perform, and unlawfully and wrongfully broke, canceled, and repudiated the contract.

S. S. Gregory and Jacob Custer, for plaintiff in error.

Charles S. Holt, for defendant in error.

Before WOODS, Circuit Judge, and BUNN and ALLEN, District Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

Concerning the letter of February 12, 1891, and its effect as a breach of the contract by the plaintiff, we said in our second opinion (46 U. S. App. 59, 65, 20 C. C. A. 233, 73 Fed. 984):

"On the facts as presented in the briefs, beyond which we have not looked, it does not appear that there was an adequate excuse for the refusal to accept further performance of the contract; * * * and, on that basis, whether other modes of relief were available or not, we think it clear that the defendant [now plaintiff] in error can have no remedy in an action upon the contract. It cannot at one and the same time repudiate an executory contract like this, in respect to a part of the subject-matter, and in respect to other parts insist upon enforcement."

In this respect it is asserted, and seems to be conceded, that at the last trial "the facts remained precisely the same," and, that being so, the court might without error have instructed peremptorily against a recovery by the plaintiff in any sum; and it would follow that there was no available error in any instruction touching the obligations, duties, or rights of the parties under their contract in so far as confined to the plaintiff's right of action,—leaving it material to inquire only whether error was committed in respect to the right of the defendant to recover upon its counterclaim. In apparent recognition of this as the true status of the case, the argument in the brief for the plaintiff in error begins by saying that the main question, concretely stated, is "whether defendant can recover full contract price for eight-inch standard line pipe, made according to the specification of the contract, in the best manner known to the art of pipe making, but which for some reason is incapable of meeting another, and, after all, the most important, requirement of the contract,—that it prove tight when tested in line at a pressure of one thousand pounds to the square inch." We have not been able to perceive that this question, as stated, arises upon the record. It does

not seem to be deducible from any exception saved and assigned as error. Touching the test under a pressure of 1,000 pounds, our ruling when the case was here before was that while the plaintiff was entitled to pipe of the character stipulated, and that—

"If at the time of the delivery it remained necessary or desirable, and was practicable, by a reasonable expenditure, to bring the pipe up to the requirements of the contract, it was the privilege of the defendant [now plaintiff] in error to make the expenditure necessary for that purpose, and to exact reimbursement of the Crane Company, instead of resorting to the proof of comparative values; but if * * * the pipe met the requirements of the modified contracts of the Indiana Company, and by reason of the Indiana statute a pipe capable of bearing a pressure of over three hundred pounds was not needed, then manifestly it was not reasonable to expend time or money on an effort to impart to the pipe a degree of strength which could be of no practical utility. Under such circumstances the ordinary rule should prevail, and the recovery should be on the basis of the difference of value between the article delivered and that which ought to have been delivered, to be determined by the market prices, or, if that should be impracticable, then probably by the difference in cost of production at the mills,—certainly not by the cost of repair or reconstruction on or along the trenches in which the pipe was to be laid, where necessarily the work would be more difficult and expensive than at the mills."

There does not seem to have been any attempt at the last trial to show, by market prices or otherwise, the difference in value between the pipe delivered and that contracted for. There has been no reference to evidence on that point, and the inference is fair that there was none. The evidence of the tests made of the pipe in line tended, as stated in our former opinion, "to show the quality and value of the pipe delivered as compared with that contracted for," but that alone was not enough to afford a basis on which to compute or estimate damages on the theory of comparative values. The trial was not conducted on that theory, but, as before stated, the effort was to show that the pipe delivered was defective,—especially that the threading of the pipe and collars was defective, that the collars were too light, and that the substitution of the Hequembourg collars was necessary in order to make the line tight, even under the reduced pressure permitted by the Indiana statute. To the extent necessary to bring the pipe up to that standard, the plaintiff in error, of course, had the right to incur reasonable expense, and to exact reimbursement, but could not at the same time claim damages on the other basis of difference of values; and there could have been no error in the refusal of an instruction which proceeded on the latter basis. The contention that, under the notice of a counterclaim which alleged the delivery of pipe in conformity to the contract, proof of strict conformity was essential to a recovery of the contract price, if in itself sound, seems not to have been insisted upon or suggested in the court below, and therefore should not be available here. If suggested, the objection could have been obviated by an amendment to the notice. No exception was saved and no error assigned which hinted at an assertion of variance between the pleading and the proof, if, indeed, such a notice of special matter of defense, accompanying the general issue, was intended to be governed by the strict rule applicable to a declaration, that the allegation and the proof must correspond. There

should certainly be a liberal practice in allowing amendments of such notices, and on appeal or writ of error any amendment should be regarded as having been made which if allowed could have caused no injustice to the adverse party.

The first specific objection to the charge of the court is that in a number of passages, to which exceptions were saved, the plaintiff was required to sustain the issues of which it had the burden by "satisfactory evidence," and not simply by a preponderance of the evidence; but the meaning of the entire charge was clear, as in some instances it was explicitly stated, that the jury should be satisfied by a preponderance of the evidence. The last expression of the court on the point was too plain to be mistaken, when, after stating that the plaintiff was not entitled to recover "unless it has established a cause of action," the court added, "It must be established by a preponderance of the evidence." In view of the nature of the issue, however, which was whether the pipe was originally defective in the threading or in the weight of the collars, or was injured through the negligence or want of skill of those employed to lay it, — on which latter point the plaintiff, having kept and used the pipe in line, certainly had the burden of proof,—it is not clear that more than a mere preponderance of evidence might not properly have been required to establish a right of recovery on the declaration.

This objection to the charge ought not to prevail for the further reason that it is not pointed out in any exception taken, nor in any specification of error, according to the requirement of our rules 10 and 11 (31 C. C. A. cxlv., 90 Fed. cxlv.), that a party excepting shall "state distinctly the several matters of law in the charge to which he excepts," and that the assignment of error "shall specify separately and particularly each error asserted and intended to be urged." To comply with that requirement, it was explained in the recent case of Stewart v. Morris (June Sess., 1899) 37 C. C. A. 562, 96 Fed. 703—

"It may be enough sometimes merely to quote the language of that part of the charge which is supposed to be erroneous. That will do if the language quoted expresses a single proposition of law with unambiguous directness, but if the quotation embraces different propositions, or, like those now before us, is supposed to carry implications beyond or outside of what is expressed, it is intended by the rule that the exception shall state the particular meaning or implication, the exact proposition of law objected to; and then, to enable this court to determine whether the language of the court embodied that proposition, either expressly or by implication, it is necessary that the language be brought up in the bill of exceptions, and set out totidem verbis, as required by rule 11, in the specification of error. * * * These rules, if carefully and intelligently followed, will accomplish the purpose of their adoption, namely, that this court shall not be compelled to consider questions not brought to the attention of the lower court."

These rules, it should be recognized, were prepared with care. Their terms are too clear to have needed exposition, yet, for some reason,—inattention, probably,—their most important requirement has not been generally heeded. While the court would not needlessly embarrass the practice by insisting upon overnice observance of its rules, it is intended, so far as practicable, to accomplish the wholesome purpose that no question shall be reviewed here which was not considered below.

For the same reason the objections urged to other parts of the charge, with perhaps one exception, might be disregarded. They are not directed to the obvious and main purport of the portions of the charge excepted to and specified as erroneous, but to some subordinate idea or implication, which, it may be, was not in the mind of the court, and which, if specifically made the subject of exception, presumably would have been corrected at the time. For instance, in that portion of the charge embraced in the fifth exception, the direct purpose of which evidently was to define a duty of the plaintiff, the jury was told that:

"For the purpose of charging liability upon the defendant for defects in the pipe and collars as laid, [the plaintiff must be held to a degree of care on its part of like character with that imposed upon the defendant,] to the extent that care and skill in the handling, screwing together, and laying equal in importance sufficiency of the pipe to secure a tight line."

The clause in brackets, and a like clause in the portion of the charge covered by the sixth exception, it is insisted, have relation to the construction of the contract, and carry the implication that the defendant might discharge its obligation under the contract, short of performance, by the exercise of some degree of care or diligence. Neither in the exception nor specification of error is that objection suggested. By the rules it should have been stated definitely as the matter of law excepted to, and should have been specified "separately and particularly" as error in the assignment of errors. It is not an obvious, but, rather, a strained, inference, not likely in itself to have been apprehended by the jury; and other parts of the charge, by which the force of the contract and the obligations thereby imposed on the defendant were clearly and correctly explained, make it impossible that the jury should have been misled as supposed.

To another part of the charge, to the effect that the plaintiff seeks to recover damages for "defects in the make and quality of the pipe delivered," and that the plaintiff had the burden of the issue, the objection urged is that "this would indicate to the jury that unless the plaintiff could establish, by a preponderance of proof, the existence of defects in the pipe, it must be regarded as up to contract." And to the part of the charge immediately following, which was to the effect that if, on the other hand, the preponderance of evidence showed that the pipe, as received, "was so generally defective in thread and taper, or in the weight or quality of the collars, or both, that it was incapable of meeting the requirements of the contract, and that the defects * * * were not obvious and clearly discoverable upon reasonable inspection on delivery, but could only be ascertained reasonably and fully by a test in line, and if the plaintiff has met all requirements [to be further explained], the finding should be for the plaintiff," it is objected that "this requires the plaintiff to prove that the pipe was so generally defective in thread and taper, or in the weight or quality of the collars, or both, that it was incapable of meeting the requirements of the contract, and that the defects were such, etc. Now, this imports that the plaintiff must prove that owing to these particular defects the pipe leaked. Obviously, this is not correct." And by way of argument it is added that "if

the pipe leaked at contract pressure because of inherent weakness, with no defects of manufacture, or in fact for any reason except improper, unskillful, or careless handling or laying by the plaintiff, there was a breach of the defendant's contract." The truth of this proposition is not questioned; it is probably undeniable; but it is inapplicable, not only because not made the subject of an exception, and specified as error, but because the defects referred to by the court were not limited to the results of manufacture. They embraced every particular in which there was claimed, or evidence was offered to show, a failure to meet the requirements of the contract, namely, "in thread and taper, or in the weight or quality of the collars, or both." All that is embraced in the words "alleged defects in make and quality"; and there was no error in the use of the word "generally," because particular defects were not alleged. If they existed, they were to be eliminated on discovery by inspection or test, and, if they could have been, were not made a subject of dispute. The actual contest was over the question whether the pipe delivered was generally defective, either in thread or taper, or in the weight and quality of the collars; and, that being so, anything in the charge touching other defects would have been irrelevant and immaterial.

Another portion of the charge is said to be obnoxious to two objections, neither of which, however, was disclosed in the exception taken or in the specification of error. The instruction referred to consists of three distinct sentences, and as many distinct propositions, any one of which might have been the subject of exception; but the two objections urged are directed to the single proposition that by the contract the Crane Company "did assume and agree to furnish pipe and collars of material, strength, weight, and threading which would substantially conform to the specifications of the contract; and it further agreed and promised that the pipe so furnished should be sufficient in those particulars, when laid in line with due care and skill, to stand a pressure of 1,000 pounds gas to the square inch, and to prove tight in line when tested." Objection is now made to the word "substantially," and to the phrase "in those particulars," as placing an unwarranted limitation upon the responsibility of the defendant; but the particulars mentioned embrace all that was in dispute, and substantial conformity to the specifications of the contract was certainly sufficient if the general requirement was met, that when in line the pipe should prove equal to the stipulated test. As the court proceeded at once to say, "It was the quality and competency of the pipe and collars to this end and test that was thus warranted by the defendant, and not a tight pipe line."

A like objection, not disclosed in the exception or specification of error, is made to another part of the charge on account of the expression "so generally defective in thread, taper, and collars, in weight, thread, and taper," and in another part to the expression "that the defects in the pipe were due to faults in the mill, with which defendant is chargeable"; but in view of the immediate context, and other expressions already referred to, there is no reason to believe that the jury was misled in respect to the obligation of the defendant under the contract.

The court instructed the jury that the provision of the contract requiring the pipe to prove tight in line should "receive a reasonable construction, both with reference to the state of the art of pipe making, and of the piping of gas, as known and existing at the date of the contract, and with regard to the conditions which must be met by this line, owing to its length, the high pressure required, and the need of economy and safety in conducting the gas to delivery points"; and proceeding, in words embraced in the exception, to refer to evidence tending to show that no gas line had been made which was absolutely tight at even less pressure than that called for in this contract, the court then repeated that "the term 'tight in line,' as employed in this contract, must be interpreted as reasonably tight in line, considering the objects and conditions of the undertaking, and the possibilities of the art and business as existing and understood, according to the evidence." While it would perhaps have been less objectionable if the instruction had been so framed as to leave it more distinctly to the jury to determine in what sense the words "tight in line" were used and understood by the parties, yet the evidence being clear that an absolutely tight line was impossible, and that the managing agent of the plaintiff considered a line tight which leaked in 24 hours as much or even more than 2 per cent. of its contents, we cannot regard the instruction as materially erroneous. Parties to a contract are entitled to its complete, and, when practicable, even literal, performance; but that does not mean that courts and juries shall give to the terms of an agreement, however clear and unmistakable the ordinary significance of the words employed, a meaning which, when applied to the subject-matter of the contract, will render performance impossible. It is enough on this point to refer to 1 Greenl. Ev. par. 286.

There was at the trial a question whether the collars should have been recessed so as to admit of calking with lead, and in respect thereto the court instructed that the contract provided for screw joints, not lead joints, and that the absence of a recess or other provision did not of itself constitute a breach of the contract, unless, in the state of the art of pipe making as it was when the pipe was made for delivery under this contract, a provision for lead calking was a mere incident or reasonably necessary to the making of a screw joint, but that if such recess was not a mere incident to a screw joint, but "a separate and additional joint, independent of the screw," "it was no part of the duty of the Crane Company, under its contract, to furnish its collars with such dovetail recess for lead calking." The word "duty," as here used, in connection with the words "under its contract," necessarily means "obligation," and is not objectionable. In other respects the charge was favorable to the plaintiff, because the contract neither expressly nor by any possible implication required more than a screw joint. That only the defendant agreed to make, and covenanted that it would stand the test; and so the jury was clearly and sufficiently instructed in another part of the charge. It was, perhaps, the privilege of the defendant to employ the recess, or any other means necessary to make the joints tight; but, excepting the things specified, there was

not, and under no possible conditions of the evidence could there have arisen, an obligation to furnish recessed collars, if without the recess a tight joint was possible. There is no reason to believe that this part of the charge injured the plaintiff. It is not to be inferred that, in our opinion, evidence concerning the use of such recesses was not competent. Evidence that a screw joint could not, in practice, be made securely and permanently tight without the aid of lead calking, would at least tend to show that the pipe and collars delivered were not in a condition to meet the requirements of the contract, and in all probability the jury took that to be the meaning of this charge. If they inferred more, it was to the injury of the defendant, rather than of the plaintiff in error.

Exception is saved to the following portion of the charge,—the only one which may be said to embrace only a single proposition or matter of law, capable of presentation under the rule by a mere quotation of the language:

"You will bear in mind, gentlemen, that defects here and there in the pipe cannot be recovered for in this action. The plaintiff sues upon a total failure of the pipe. He cannot recover (in this action, at any rate) for defects which may have existed here and there in the pipe. It must be a failure which extends, as I have explained to you, through the whole lot of pipe, so as to make it insufficient for the purpose of that line. And you will then consider the testimony of the inspectors in that view and for that purpose."

Whether or not evidence of "defects here and there in the pipe" —a very indefinite expression, surely—was admissible under the declaration, we need not decide. It does not appear, and is not claimed, that such evidence was offered. The actual contest, as already explained, was over the condition and quality of the pipe and collars used in the construction of the line as a whole. The only proper application of this charge would seem to have been to pipe or collars that were rejected, and not used in the line, because found unfit. It is said in the brief of the plaintiff in error that the injurious character of this charge is apparent from the fact that the undisputed evidence shows that between twenty and twenty-five miles of the pipe in controversy was condemned on a joint inspection by representatives of both parties. It is evident that "defects here and there" could not have been understood by the jury to refer to such a quantity of pipe which had been condemned by mutual agreement. The statement of fact, however, is not fully borne out by the evidence. There was a species of inspection of pipe and collars, which had been delivered along the line, conducted by an agent of the plaintiff with the assistance, going little beyond observation, of a representative of the Crane Company; and joints of pipe and collars found defective in the thread or seam were marked, and written reports thereof were made, which were signed by both agents. But the defects found, it is evident, were, in the main, trifling. They did not prevent the use of the pipe in the construction of the line. The plaintiff's inspector testified that the majority of it was used "right along in making the new line, with the Hequembourg collars." There was no attempt in that inspection to determine whether the defects discovered were attributable to faults in manufacture or in the handling.

Portions of the charge touching the force, as evidence, of certain letters written by Mr. Crane, are objected to on two or more grounds; but, besides failure to take a specific exception and to assign the error accordingly, the letters referred to are in no way identified, nor their place in the record pointed out. We cannot undertake to search for them through a bill of exceptions which fills more than four hundred pages of the printed record.

The following instruction, it is said in the brief, was asked "as to the burden of proof":

"Plaintiff was not bound to receive from the defendant any pipe whatever which did not conform to the requirements of the contract, in its capacity, if properly laid in line, to prove tight in line at a pressure of one thousand pounds to the square inch, gas or air; and, unless you find from a fair preponderance of the evidence that the pipe delivered by the defendant under the contract to the plaintiff, was up to the contract requirements in this regard, the defendant is not entitled to recover the contract price thereof, however you may find as to other matters in evidence."

Without the statement in the brief, it could hardly be suspected that this was designed to be an instruction "as to the burden of proof." No ordinary jury could understand its significance in that respect. It is in itself objectionable. There was no question in the case of what character of pipe the plaintiff was bound to receive, and what it was proposed to say on that point, unless more was added, was liable to be misleading in respect to the liability of the plaintiff to pay for pipe which had been received and used. If the pipe was not up to the contract requirements, under a pressure of 1,000 pounds, and yet was of no less value on that account, being equal to all the requirements of the situation, as altered by the statute limiting actual pressure to 300 pounds, a recovery of the contract price was not improper.

By another part of its charge, after referring to evidence touching the manner in which the pipe was laid, and particularly portions which had to be bent, the court directed the jury to "determine from all the testimony whether the neglects in the manner of screwing together and laying were of such a nature that they could fairly and reasonably account for the leaky quality of the portion of the line which was put together and tested, and for a large portion of the defects which were found by the inspectors in the pipe as examined in November—December, I believe it was—of 1890." The criticism on this, now said to be obvious, but which was not suggested below, is that, of the 106 miles delivered, only twenty miles were laid, and they were not covered by the inspection; that the remaining 86 miles were never laid or screwed together, and therefore it was obviously erroneous to tell the jury that they should determine from all the testimony whether the defects of screwing together and laying were of a nature to account for a large portion of the defects found by the inspectors. No reference has been made to the evidence on which this criticism is based, but, while the last clause of the instruction seems to introduce an element of possible confusion and inconsistency of thought, it is not to be supposed that a jury of ordinary intelligence, aiming at an honest conclusion, was led thereby to believe it possible, or to understand that the charge was intended to mean,

that defects in pipe caused by negligence in screwing together and laying could account for defects found on inspection of other pipe which had never been so treated. Besides, it is not true that the 86 miles of pipe was never laid or screwed together. The testimony already referred to shows the contrary, and it is not impossible that the evidence touching its laying should have thrown light upon, and in some degree should have explained, if it did not strictly account for, the defects found and reported by the inspectors in December, 1890. If counsel perceived at the time the danger of this or any other instruction being misunderstood, it was their privilege and duty to ask a correction, and, if they did not perceive the danger, the greater the improbability that it was real, and the stronger the reason for enforcing the rule designed to prevent the subsequent hunting out of objections to be urged on appeal which were not brought to the attention of the trial court.

The court, we deem it clear, did not err in admitting proof of tests made during the progress of the trial, at the shops of the defendant, of collars produced in court by the plaintiff in error as samples of defective collars received of the defendant under the contract. The supposed defect being in the collars, it did not affect the competency of the evidence that the test was made by applying them to pipe which had not been delivered under the contract. The court, on the other hand, excluded evidence of tests made by the National Tube-Works Company of one mile of pipe composed of "regular eight-inch line pipe manufactured by that company"; but, as that line was constructed for the purpose of making the test, and contained neither pipe nor collars which had been delivered under the contract, it was a collateral matter, not directly pertinent to any issue in the case, and even if, in its discretion, the court might have admitted the evidence offered concerning it, the refusal to admit it was not error.

The court refused a special request for an instruction defining the obligation of the defendant under the contract, and declaring it not sufficient to relieve the defendant from the obligation, if, in the opinion of the jury, a pipe made with the best skill and materials, according to the specifications of the contract, would be incapable of standing the stipulated pressure test. The court in its own charge very clearly defined the obligation of the defendant to furnish pipe capable of standing the required pressure, and proving tight in line. There was no suggestion or claim by the defendant that it could be relieved from the obligation of full performance on account of any supposed or proven impossibility or difficulty of making pipe capable of doing what was required. On the contrary, the persistent contention of the defendant was that the pipe delivered had that capacity, the shop tests made before delivery as well as that made during the trial showed that it had, and the verdict shows that the jury was convinced of the fact. But, if the request had been in itself unobjectionable, there would have been no error in refusing it, because, in substance, it was embraced in the charge given.

Considering the length of the court's charge, and that it was not given in writing, it is not remarkable that in some respects it is obnoxious to verbal criticism; but as a whole it was notably clear and

impartial, and, convinced as we are that the trial was a fair one, we do not think that for any reason offered it ought to be annulled. The judgment below is affirmed.