## LAFAYETTE BRIDGE CO. v. OLSEN.

### (Circuit Court of Appeals, Seventh Circuit.  April 30, 1901.)

### No. 717.

1. MASTER AND SERVANT—DUTY OF MASTER—APPLIANCES AND PLACE TO WORK.

A master owes a positive duty to his servants to use ordinary care to furnish appliances reasonably safe for their use considering the nature of the service, and to provide a safe place to work, and keep it in suitable condition. Where he delegates such duty to another, he is responsible for its proper performance by such other, although the latter may be, as to other matters, a fellow servant with the other employés, for whose negligence the master is not responsible to them.

2. SAME—DUTY OF INSPECTION.

A bridge company owes a positive duty to its employés engaged in building a steel bridge over a river, the materials and parts of which are supported by a temporary wooden structure during the work, to furnish timbers for such structure which are reasonably fit for the purpose, and to have the same inspected by a person having the requisite technical knowledge and experience to qualify him for the duty. Where, in such a case, no inspection was made, but the timbers and plank used were selected from a larger quantity by common workmen, by direction of the foreman in charge of the work, the company is liable for the death of a workman caused by the breaking of a defective plank, which was required to support a heavy load, the unfitness of which would have been disclosed by a proper inspection by a competent person, but was not apparent to an unskilled man.

3. SAME—ACTION FOR DEATH OF SERVANT—QUESTIONS FOR JURY.

Where it was the duty of a master to cause proper inspection to be made of the timbers used in the false work built to support a steel bridge in course of construction and the workmen engaged upon it, the question whether the breaking of a plank used in such construction, which was not inspected, was due to a defect which such inspection would have disclosed, so as to charge the master with notice of it, is one for the jury in an action to recover for the death of an employé resulting from such breaking.

4. TRIAL—INSTRUCTIONS—WEIGHT AND EFFECT OF EXPERT TESTIMONY.

Where a question at issue in an action against a master to recover for the death of an employé was whether the defect in a plank, the breaking of which was the cause of such death, was one which would have been disclosed by a proper inspection, and one piece of such plank was introduced in evidence, the jury were properly instructed that in determining such issue they were not restricted to the opinions of the expert witnesses, but had the right to use their own intelligence and the knowledge and experience of lumber which they brought with them into the jury box, in connection with their inspection of the exhibit.

5. APPEAL—REVIEW OF CHARGE—SUFFICIENCY OF EXCEPTION.

To entitle a plaintiff in error to the review of instructions, the exception taken must have been sufficiently specific to point out to the trial court the particular matter of law objected to.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The defendant in error brought suit to recover damages for the death of her intestate, John Olsen, who was drowned in the Illinois river through falling from a temporary bridge or scaffolding while in the service of the Lafayette Bridge Company. The declaration contains six counts. The first four counts substantially charge that the Lafayette Bridge Company, in charge of and engaged in constructing a bridge across the Illinois river near the city of Spring Valley, negligently suffered the bridge to be in bad and unsafe condi-

tion, and to be erected in an unsafe manner; that the bridge and the scaffolding used in its construction rested upon planks of insufficient size and strength, and insufficiently braced or supported to bear the weight placed upon them, by reason whereof one of the planks was broken, and Olsen, then pushing a car laden with material for the bridge, was cast into the waters of the Illinois river, and killed. The fifth count, charging incompetency of the foreman, need not be stated, as no evidence was adduced to support it. The sixth count charges that the bridge company furnished for the scaffolding to be used in the erection of the bridge unsound, knotty, imperfect, weak, and insufficient planks and boards for the construction of the scaffolding, or temporary structure, to support the permanent structure of the bridge while in course of erection; and that one of the planks used broke, causing Olsen to be cast into the waters of the river and drowned. Concerning the principal facts of the case there is not much dispute, and they are, in the main, stated correctly in the briefs. In the spring of 1898 two spans of a bridge extending north and south over and across the Illinois river near Spring Valley were washed out. The bridge company contracted to put in a temporary structure for immediate use, and then to replace the two spans washed out with two spans of a steel bridge. In May, 1898, the bridge company constructed the temporary bridge, supported on rows of piles driven into the bed of the river, with a flooring of 3x12 inch pine boards. In July, 1898, the construction of the new bridge was commenced. The temporary bridge was removed, with the exception of the rows of piles, and possibly the crossbeams fastened across the top of each row. The planks were piled upon the uninjured part of the original bridge for use in making the floor of the permanent bridge. From this pile of planks, estimated at 230, were taken such as were needed to construct the false work or scaffolding, which was a temporary structure built upon the rows of piles, and the span of the new steel bridge rested upon it during the process of construction and until put together so as to become self-supporting, when the false work and piles were to be removed. In the construction of the permanent bridge the steel work was hauled upon the temporary bridge to the point where it was to be used on a hand car pushed upon one of the spans of the new bridge. Each span was about 200 feet in length, and consisted of 10 panels, each panel being 19 feet 10 inches in length. At the time of the accident the north span, including the laying of the floor, and the steel work of four panels of the south span, had been completed. Work was then being done on the second panel from the north end of the south span. The flooring of the temporary structure on that part of the bridge had been necessarily torn up. A track was made on which to run the car upon which the steel was hauled to the point where it was to be used. In the panel where the accident occurred there were two planks upon which the I-beam rested on the west or down-stream side. They were designed to extend the distance between two bents, about 17 feet; but for a distance of about 8 feet from the north piling there was but one plank, the top plank extending only to a point 8 feet from the north piling, the other end of it extending over a portion of the panel immediately south. On the evening before the accident the car was loaded with two steel chords each 19 feet long, and each of the weight of 925 pounds, placed lengthwise on the car. The car was 8 feet long and 4 feet wide, and weighed 300 pounds, and was pushed to the edge of the completed span, and there left for the night. Upon resuming work in the morning, four or five men, including the foreman and Olsen, began to push it along the track to the place desired. When the car had gone a distance of about 15 feet, the lower one of the planks supporting the I-beam, which in turn supported a portion of the track and load, broke, causing the track to sag, producing displacement of the track and boards at that point. Immediately afterwards Olsen was seen in the river, coming near to the surface of the water, but he sank again, and was drowned, his body being recovered about an hour afterwards. The plank that broke was defective, having in it a curl in the grain of the wood at the point where it broke which weakened it, and rendered it insufficient to support the weight placed upon it. It had been in use in the floor of the temporary bridge, and was a 3x12 inch pine plank, and new when put into the temporary floor, where it had been in use from two to three months. It had been taken out with the rest of the planking, and

placed at the north end of the bridge in a pile, for use as occasion might require. Olsen had assisted in removing and piling up these boards and in taking the planks from the pile and laying them upon the structure. The material was furnished by the bridge company. The work was in charge of one Luke, who was the sole representative in the state, of the bridge company, hiring, paying, and discharging the men, doing all the buying and all the paying. Olsen was a common laborer, principally engaged as a teamster and roustabout. He did not work on the temporary structure, the uncompleted part of the bridge, but, under the direction of Luke, assisted in hauling the planks to the point desired. It is assigned for error that the court erred in its refusal to direct a verdict for the defendant; that it erred in the admission of evidence; that it erred in its refusal to instruct and in its instructions to the jury, as sufficiently stated in the opinion of the court.

George P. Haywood, for plaintiff in error.

A. R. Greenwood and Henry S. Robbins, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

We have held in Reed v. Stockmeyer, 34 U. S. App. 727, 20 C. C. A. 381, 74 Fed. 186, that it is the duty of the master to use ordinary care to furnish appliances reasonably safe for the use of servants,—such as, with reasonable care on his part, can be used without danger save such as is incident to the business in which such instrumentalities are employed; that it is also the duty of the master to use like care to provide a safe place in which the laborer may perform his work, and to keep it in a suitable condition. These duties may not be foregone, and, when delegated to be performed by another, that other is a vice-principal, and quoad hoc represents the principal, so that his act is the act of the principal. That other may have a dual character, —vice principal with respect to the duty due from the master to the servant, and co-servant with respect to his acts as a workman. In case of injury, the question of the liability of the master turns rather on the character of the act than on the relations of the servants to each other. If the act is in the discharge of some positive duty owing by the master to the servant, then negligence therein is the negligence of the master; otherwise, there should be personal wrong on the part of the master to render him liable. These principles we understand to be established by the ruling of the ultimate tribunal. Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, 37 L. Ed. 772; Railroad Co. v. Keegan, 160 U. S. 259, 16 Sup. Ct. 269, 40 L. Ed. 418; Railroad Co. v. Charless, 162 U. S. 359, 16 Sup. Ct. 848, 40 L. Ed. 999, Railroad Co. v. Conroy, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. Ed. 181. This duty of the master owing to the servant is not absolute, but relative, measured by the nature and character of the employment and the nature of the location and the surroundings. In the case at bar the work to be done was accompanied by danger arising not only from location, but from the great weight to be supported. In furnishing plank to be used for such support, the master owed to the servant the positive duty of furnishing material reasonably fit for the purposes of the contemplated use. In the reasonable dis-

charge of his duty he should ascertain if the plank furnished were reasonably sufficient to bear the weight to which they were to be subjected. That was matter of technical knowledge and experience, which could not be left to the judgment of a common laborer. It was also the duty of the master to have proper inspection of the lumber furnished, to ascertain its soundness, for upon that depended its breaking strength and its ability to sustain the ordinary working strain to which it would be subjected. It was incumbent upon the master, under the circumstances of this case, and in view of the peculiar defectiveness of the plank that broke, to have shown that such inspection was had before the employment of the material in work in which life was at stake if the material was defective. So far as the record discloses, no such inspection was had. The plank in question had a curl in the grain of the wood at the point where it broke, rendering it wholly unfit to support the weight placed upon it. Mr. Modjeski, a witness for the plaintiff in error, and a consulting engineer of considerable experience, states, with reference to the defective plank, a portion of which was produced as an exhibit: "The curl would very much diminish the strain the board would bear. It is curled on both edges. It looks as though the fiber was discontinued entirely." He further asserted that ordinarily the defect or curl would probably pass unnoticed; that he did not think a foreman in constructing the false work for the bridge would notice the defect; that there was a break in the plank which could be seen by close observation; that the defect might be observed by close inspection; that "I think that a man whose business it was to construct scaffolding upon which the lives of men depended, and whose duty it was to see that he got sound lumber, would see the curl of the lumber with the naked eye." The engineer of the bridge company testified that a man of ordinary care would very likely not have observed the defect, although "it is a question hard to answer, unless you have it all here" (referring to the fact that but part of the broken plank had been produced); that planks sometimes have such defects that cannot be observed except upon careful inspection. If the duty of inspection was delegated to the foreman in charge of the work, it was not performed. He instructed common laborers to select the plank, and to pick out the best. Such selection, however, is not the inspection which duty to the servant required. The common laborer might form some judgment between two sticks of timber, and select the better one as they appeared to his uninformed and inexperienced mind; but he could not discover that which required for its ascertainment technical knowledge of woods and the ripened judgment of an expert. There is no evidence of inspection by principal or by vice principal; and, failing therein, the master is chargeable with knowledge of such defects as would have been ascertained by proper inspection by a competent person. The evidence produced by the master renders it probable that proper inspection would have discovered the defect. It was a question to be submitted to the jury whether the duty of inspection and the duty to furnish suitable material had been performed. The request to direct a verdict was, therefore, properly overruled.

The plaintiff in error preferred three requests to charge the jury, which are substantially to the effect that, if the bridge company had furnished an abundance of suitable material and appliances from which the foreman and other workmen engaged in the construction of the bridge could select such as was needed for the several parts of the temporary structure, then the defendant had performed its duty, and is not liable for any mistake in judgment by the foreman or other servants in the selection of suitable material out of the mass provided for use, although the plank in question was defective. There is one objection common to the three requests which renders them improper. Each of them excludes the question of the duty of the defendant in a work of this character to have proper inspection of the lumber furnished. It is not sufficient discharge of the master's duty that sufficient good material should be mingled with bad material in a common mass. As we have pointed out, the duty of inspection could not be put aside or delegated for performance to ignorant and inexperienced men. If the defect were obvious, the master failed in duty in permitting the use of the defective plank. If proper inspection would have disclosed the defect, although it was not apparent to the uneducated eye, there is imputed to the master knowledge of that which a proper inspection would have furnished. If the defect were latent, and not discoverable upon proper inspection, the master would not be responsible, for his failure to inspect worked no harm. The requests to charge wholly ignored this duty of the master, and their rejection is therefore unavailing.

In submitting to the jury the question whether the defect was such as to charge the master with notice of it, and referring to the fact that only a part of the defective plank which was broken was exhibited, and to the testimony of expert witnesses that had examined the part of the plank in evidence, the court charged the jury that they had a right, from all the circumstances in the case, and from their inspection of the piece exhibited, to determine what, in all probability, the other side or end of the plank would show if produced; that the jurymen had a right to use their experience of lumber of this kind, and supply, as far as that experience and their good judgment went, the missing portion of the plank; that they were not restricted to the testimony of witnesses; that they might use their own intelligence, and their own experience with lumber, and the knowledge which they brought with them into the jury room; and that it was their duty to use that information as much as the information they got from the witnesses. The question then being considered was whether the defect was obvious, and whether proper inspection of the plank would have disclosed the defect. Experts in woods had testified upon the subject, and there was possibly some conflict in their evidence, although, as we read their testimony, there was not much dispute that a proper inspection by an expert competent to judge of the sustaining strength and the character of woods would have discovered the defect; but, assuming the conflict, we think it competent for a jury, in judging of the opinions of experts, to bring to the question the application of their own

knowledge and experience. The experts testified to their opinions. The force of such opinion is to be determined by the jury, and they might properly bring to bear, in considering the value which they should place upon the opinions expressed, their own good sense, judgment, and experience.

In Head v. Hargrave, 105 U. S. 45, where witnesses had testified to the value of professional services, the court, by Mr. Justice Field, said:

"To direct them [the jury] to find the value of the services from the testimony of the experts alone was to say to them that the issue was to be determined by the opinions of the attorneys, and not by the exercise of their own judgment of the facts on which their opinions were given. The evidence of experts as to the value of professional services does not differ in principle from such evidence as to the value of labor in other departments of business, or as to the value of property. So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given opinions expressed, and it was only in that way that they could arrive at a just conclusion."

In The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510, 41 L. Ed. 937, damages were claimed for the detention of a boat, and it was urged that the amount of the damage should be determined by the testimony given as to the value of the use of the boat. The court, by Mr. Justice Brown, observed:

"While there are doubtless authorities holding that a jury * * * has no right arbitrarily to ignore or discredit the testimony of unimpeached witnesses so far as they testify to facts, * * * no such obligation attaches to witnesses who testify merely as to their opinion; and the jury may deal with it as they please, giving it credence or not, as their own experience or general knowledge of the subject may dictate. * * * The ultimate weight to be given to the testimony of experts is a question to be determined by the jury, and there is no rule of law which requires them to surrender their judgment, or to give a controlling influence to the opinion of scientific witnesses."

In the fourteenth, fifteenth, sixteenth, and seventeenth paragraphs of the charge, to which exceptions were taken, the court below dealt with the question of the character which the foreman assumed with respect to the selection of this plank, and whether selection of it by him would be selection by the company, and his negligence in the selection the negligence of the company; or whether he stood in the light of a fellow servant, and therefore the master would not be responsible for his act. The court charged that under the circumstances the foreman stood in the stead of the company, and his act in that respect was the act of the company; "that, if it were within his opportunity to prevent the use of this plank, and from his neglect this plank went into the structure of the false work, then that negligence is imputable to the company, the same as if the company were itself present, and had taken the plank he actually took, and placed it in the structure." The court further charged that, if the jury were satisfied "that the plank in question was defective, and that the defect was obvious, and that it being placed there in this false work was negligence of the foreman, and that the foreman had an opportunity or had knowledge of its having been placed there, and that the foreman had all the powers which I have named, and which

are not disputed, the company would be responsible for his neglect." It may not be denied that in the argumentative part of the charge leading up to the instruction stated there are some things stated of doubtful correctness, and, if given in a charge to a jury, when the question of principal or vice-principal hung in the balance, we should hesitate to sustain them. It must be remembered, however, that there is here total failure of evidence that the master had procured this lumber to be inspected; that by authority of the master the lumber was purchased by, and used under the direction of, this foreman in this work. The duty of inspection would seem from the evidence to have been delegated to the foreman. There is no evidence that that duty was performed by him. In respect thereof he stood for the master, and was vice-principal, and was not co-servant with those employed upon the structure. The charge to which objection is taken makes the question of liability to depend upon the question whether the defect was obvious, and the defective plank placed in the false work through the negligence of the foreman. If any just exception can be taken to this charge, it is that it was too favorable to the bridge company. It was not bound only in the event that the defect was obvious. It was chargeable with such knowledge as a proper inspection would have given. The defect may not have been obvious to the untrained eye and the unskilled laborer, or to the foreman; but to one experienced in woodcraft, as the evidence shows, the defect might have been discovered, and, if discoverable, the master is chargeable with the knowledge which inspection would have given.

Certain evidence was objected to upon the ground that it was not cross-examination. It is largely a matter of discretion with the trial court to determine the extent to which a cross-examination will be permitted, and we are not disposed to interfere with that discretion where it is manifest—as we think it here is—that a just verdict has been rendered, and that the testimony objected to could not have improperly affected the result. The exception to that part of the charge bearing upon the testimony so adduced is too general, failing to indicate the ground of objection. Stewart v. Morris, 37 C. C. A. 562, 96 Fed. 703; Columbus Const. Co. v. Crane Co., 40 C. C. A. 35, 98 Fed. 946; Id., 41 C. C. A. 189, 101 Fed. 55; Adams v. Shirk, 43 C. C. A. 407, 104 Fed. 54.

We have considered the other objections urged, and do not find them of sufficient merit to warrant discussion of them. The judgment is affirmed.